without further ado, may please proceed. Thank you, Your Honor. May it please the court, Yakov Roth on behalf of the defendants. I am hoping to save about three minutes for rebuttal. I'll watch the clock to make sure I do. Your Honor, this court should stay the injunction because it is fundamentally flawed on multiple levels. I'd like to start with the issue of standing to seek an injunction. We do think this case is controlled on that issue by the decision in Lyons on the Article III issue and by this court's on-bank decision in Hodgins-Durgan on the related question of imminent irreparable harm. The district court here did not find that any named plaintiff faced a real immediate threat of a suspicion was sought. The court only said that the alleged practices of the defendants would generally continue and that is not enough to make this an Article III controversy under Lyons. It's certainly not enough to justify an injunction under Hodgins-Durgan. And plaintiffs try to bridge the gap, as I understand it, by arguing the existence of an official policy of violating the Fourth Amendment with these stops. And I would respond with three points on that. The first is, as a matter of law, I don't think that a policy alone is sufficient in both Lyons and Hodgins-Durgan. There were allegations of widespread policy of violating the Constitution and that did not change the outcome. Excuse me. There are multiple cases that have, in which Lyons has been asserted and found not applicable. And it seems to me that the characteristics of those cases are applicable here. First of all, the chain of causation is very different here, is it not? In other words, one big problem in Lyons is that the person had to first be arrested before he even had a problem, even potentially had a problem. And the assertion here is not based on anything the plaintiffs are doing except being there. Why doesn't that matter? So that is a distinction, Judge Berzon. It distinguishes Lyons. I don't think it distinguishes Hodgins-Durgan which was alleged to be random stops of cars by the Border Patrol. And in Hodgins-Durgan, this court said that difference might matter for Article III purposes. It didn't say it did. It said it might matter for Article III purposes. But nonetheless, it wasn't going to be enough to justify an injunction as a matter of equitable, the equitable factors, because you still, the plaintiffs still have to demonstrate a sufficient likelihood of imminent harm in the future. So even if you kind of get past that first issue, I don't think you can get past the second issue. Sorry, go ahead. Go ahead. You go ahead. The plaintiffs all, in terms of the cases that distinguish, you know, the plaintiffs mostly rely on two, LeDuc and Melendrez. And there are, I think, a couple of important differences between this case and both of those. The first is, in both of those cases, the defendants admitted the policy that was being challenged. In this case, the defendants squarely denied the policy that Plaintiff's Claim exists. That's at docket numbers 71-1 and 71-2 in the District Court. And the District Court here did not find an official policy. The District Court said in footnote 33 that the plaintiffs had not identified an official policy, and the court thought that didn't matter. And later in the opinion, in footnote 36, the court said the defendants don't have to change their training, they don't have to change their policies, because it seems that both of those are perfectly fine. It's just a matter of how it's being put into place in the field by particular agents. And... It did shape a particular agent. She said that there was an overall... She said there was no written policy, but that there was a definite pattern in practice which amounted to a policy. That's what I understood her to say. Yeah, it's a little unclear, Your Honor. I don't... It's not just that she said no written policy. I understand it doesn't need to be written. But the court said in footnote 33, the District Court said, court finds this pattern of conduct is sufficient evidence, even if there is no official policy to engage in roving patrols. And then later in the footnote said, although there is no testimony from defendants' field agents with respect to the policy being carried out on the streets, the court finds based on evidence that is before the court, plaintiffs have sufficiently shown that defendants' policies are being carried out differently. For this reason, the court also finds, if not this positive, the plaintiffs have not pointed to any official policy that authorizes or ratifies the alleged roving patrols. So, it's a little bit unclear exactly what the court was saying there, but I there was an official policy. I think the court was saying, I think I've seen enough to believe there's a pattern. Even on that, respectfully, Your Honor, we don't think that is close to substantiated based on the record that the court had before it. All the court had really was a series of declarations from individuals who say they were stopped or questioned or detained or arrested. But that alone doesn't tell us whether the Fourth Amendment was violated in connection with those stops. It's really only, even in those particular cases, let alone the existence of a broader overarching policy, it really only tells us that particular people were stopped or arrested. I think the court recognized that sort of hole in the evidence, but tried to sort of shift the to defendants for not having put in sufficient material to justify reasonable suspicion for the various stops that plaintiffs had identified in the declarations. And respectfully, I don't think the procedures that the district court employed were even close to adequate to allow for that kind of determination to be made. I mean, what happened here is the plaintiffs spent weeks collecting dozens of anecdotes from across the district about particular stops that had occurred. And the district court said it was reasonable for them to take a month to put that all together. Fine. But then we got two business days to respond, not only to all of that, but also to the separate Fifth Amendment ex parte TRO that they filed at the same time. Plaintiffs say you've got a week. Why is there a difference there? It was Thursday night before the 4th of July weekend, and our response was due Tuesday at 5 p.m. So we had two business days and a long weekend. And to reach back multiple weeks across multiple agencies to reconstruct multiple stops that they had identified, many of which were only identified with pseudonyms or otherwise without much identifying. You then submitted additional declarations with the stay motions, as I recall. So the first one, the initial three set of plaintiffs or petitioners, the three original petitioners were all arrested at the same time in the same incident. And so we had started looking into that one because it was the original one. And so by the time of the stay motion, we were able to put in a declaration saying, by the way, the court was wrong about that one. It was a targeted operation. It was not a random people driving by and, look, we see some people who appear Hispanic at the bus stop. Let's pick them up. It was based on particular intelligence about that location. Well, there was extreme, there was almost, you said that, but you didn't provide any evidence of who was being targeted or how were supposed to know what's being targeted or what you knew or anything about it. It was a pretty general declaration, that's correct. I think it's illustrative that if we had actually sufficient time to build a meaningful record on the particular stops, but then you had a second stay motion in the district court and you still didn't find anything else. It was with the second, this was with the second, the written stay motion is when we filed this declaration on the particular, your files along with us. And then you find one, you find one in the district court before your first motion with us. I don't know that you filed a second one in the district court. We filed a written stay motion first with this court that attached this declaration. Right. And the same declaration was in the district court. There was not another declaration. The same declaration we then refiled in the district court. So even though there were several more days, there was still no more. Yeah, that's right. But I mean, by that point, the adjudication had been made. So we were not trying to disprove everything at that point. We were trying to show, look, the speed at which this proceeded and the procedures that the district court used weren't adequate. And this is one example, because actually we can, if there was a hearing on this with evidence, we could actually put somebody up to explain why those three individuals were arrested and detained. It was not- They were made free to do that in the PI hearings, right? Well, that, I think, depends on what transpires in this court. But we didn't have that opportunity before we got the order below. And that, I think, is the problem, because the district court didn't have a sufficient record to draw the kind of determination that you would have to make to support this sort of sweeping injunction. I mean, that is by definition what the nature of a TRO hearing is, right? I mean, it's actually intended to be ex parte, and the district court gave you more opportunity to respond than normally contemplated. And then there's supposed to be a temporary measure while there is a full-blown PI hearing at which you would have more opportunity to present evidence. That's my understanding of the intent of the rule. That's right. I don't think that's an excuse for not holding the plaintiffs to their burden of actually proving the existence of a policy that is likely to affect these named plaintiffs in the future. Temporary restraining order is actually- I mean, the standard is supposed to be higher for the plaintiffs to show, because of the sort of extreme expedited nature of it, they need to make, I think, a higher showing than they would need to make ordinarily to show that that extraordinary remedy is appropriate. Okay. What about the three organizational plaintiffs? One of the organizational plaintiffs was not on this issue, but there were three that and they all alleged that they had been versus them with specific names who were being affected, and that there were large numbers of such people. Isn't that fundamentally different from Lyons and from Hodger and Jergen as well? Well, first point, Your Honor, the district court didn't rely on the organizational plaintiffs, didn't find standing on the part of the organizational plaintiffs. Okay. Does that mean that we can't? Well, to the extent that it involves any kind of factual determination, I'm not sure it would be appropriate for this court to make that determination on appeal. The second point is the individual members that they are identifying are not differently situated, I don't think, in any legally material way from the name plaintiffs. There are a lot more of them in terms of the notion of the likelihood of them encountering the same problem again. There's more of them, but as a particular individual, one of them, the odds are not any higher than for Mr. Lyons or Mr. Hodger and Jergen. For any particular name plaintiff or named member of an organizational plaintiff, there's no basis to infer that that person is going to be subject to a suspicional assault in the future, especially given the lack of any record evidence of a policy of doing this. Counsel, I'm sorry to interject, but can you tell me the government's view of what is the principle issue that we have to decide today? Thank you, Your Honor. I think there's two questions, really, principle questions presented. One is the standing of the plaintiffs to seek this injunction, and the other is, and I'm happy to pivot to this now, given the time is collapsing, is are the Fourth Amendment merits of the injunction? Because I think even if you assume the district court did have jurisdiction and the plaintiff had standing, this injunction on its face is impermissible under established law. Is the only thing before us today whether that injunction is permissible? Well, technically the question is whether the court should stay that injunction pending appeal. That's what I thought it was. Yes. It was a question of whether there could be a stay. That's right. Let me ask you another question. It's not precisely on that issue, but as you were answering Judge Grisanti, Judge Kohler earlier and saying something was not a policy, I just want to clarify as to what you mean by a policy. Is it, for example, a policy of the administration at this time to deport 3,000 persons per day? Not to my knowledge, Your Honor. The policy that I think matters for purposes of this injunction and this motion to stay is, is there a policy of conducting detentive stops without reasonable suspicion? Are you saying there is no policy to deport 3,000 people a day? I'm not aware of any policy. But I'm focused on the detention, not the deportations, because this case is about detentions, not about deportations. And there's definitely no policy of conducting detentions without reasonable suspicion. I don't think there was, I mean, yeah, there's no policy that says we're going to conduct expressly, you know, stops without reasonable suspicion. But I think the argument or the allegation is that there is a policy of conducting detentive stops based solely on some combination of apparent race or ethnicity, specifically Hispanic or Latino, that language, speaking Spanish or speaking English with an accent, locations in the area which, according to your own declarations, are chosen based on information that in the past some unspecified number of illegal aliens have used or found work in that location or that type of location and a general sense of type of work loosely based on how they look. And that is, that policy is supported or practiced for this operation, at least is, according to your own declarants, happening and is supported by the record. And so if that lacks the type of reasonable suspicion that this court has said is necessary, that that is too broad a profile to support a finding of individualized reasonable suspicion, then there is a policy that violates the Fourth Amendment. So let me take that on directly, Judge Stumpf. The declarants, the government's declarants said we stop people when there's reasonable suspicion and that those factors are relevant to reasonable suspicion. And this court has said in Valdes-Vega on bank, I'm just going to quote it because I think it's directly on point here, the nature of the totality of the circumstances analysis also precludes us from holding that certain factors are presumptively given no weight without considering those factors in the full context of each particular case. That's not what, that's not what I said and that's not how I read the district court's order saying those get presumptively no weight. They said those factors in and by themselves are just a broad profile that don't support reasonable suspicion. And that is consistent with both Valdes-Vega and our case law, but that still doesn't address my question. If that, if that is correct as a matter of law, then you don't, I mean, it's conclusory for you to say we don't have a policy of violating the Fourth Amendment. The question is, is there enough evidence to show you have a policy of stopping based on information that doesn't amount to reasonable suspicion, that only amounts to a broad profile. So let me answer them two ways. Number one, factually, I don't think there's a basis in the record to say even that much, because I don't think we have any real information in the record from the government's side of any particular SOF. So we don't know what basis they had for any of these particular SOFs. Where in my motion do you even make that argument? You, your motion focused on standing and the terms, the vagueness of the TRO. You, I think in your, in your opening stay motion, you had exactly one conclusory sentence about the merits of the district court's Fourth Amendment analysis, which, you know, arguably is a forfeiture of any attack on her specific findings or her conclusions of law on the Fourth Amendment. Okay. So, so Your Honor, the reason that this policy question has come up in the, more so in the reply is because I understood plaintiff's response to the Lyons issue to be saying, oh no, that's different. There's a policy here that we don't think the district court made that finding, which is why we didn't attack it. But if the district court had made that finding, it would have been clearly erroneous given the lack of information in the record. That's different though. My understanding is that after the stay motion here, I have to say after the district court injunction here, the secretary of Homeland security said, we're going to continue doing what we're doing. Well, the policy is to follow the Fourth Amendment and to require reasonable suspicion. And our point on the law is your policy, not to use these four factors alone as sufficient to show reasonable suspicion. You haven't ever said that. I don't think there's a policy either way. Legally, I think it's appropriate to use the factors for reasonable suspicion. I think this court's cases squarely support that proposition. Actually, this court's cases seemed, and there are a number of them. If you put them all together, Paris, Cruz, Manzano, Jurado, Montero, Camargo, Duke, if you put them all together, they seem to fully support the conclusion that where people are working or where they are standing or that they're speaking Spanish or that they're Hispanic singly or in combination is insufficient. So I disagree with that, your honor, on two levels. One is per Voldez-Vega. Again, I'm just going to read this. We may conclude that some factors in a particular case are more probative than others, but this evaluation cannot be done in the abstract by divorcing factors from their context in the thought at issue. Someone has suggested that you cannot consider these factors at all, but we have multiple precedents saying these factors alone only form a broad profile, and you need more to find individualized suspicion necessary to satisfy the reasonable suspicion standard for detentive staff. And the Supreme Court itself has said that we do de novo review of Fourth Amendment determination because there are standards, applicable standards in the Fourth Amendment context. Yes, we can't exclude, say categorically, this factor you cannot consider ever, but we can say, and then we do do analogous case matching to say these things are insufficient. Your honor, I don't think we can say that they're insufficient in the abstract. We're not saying it in the abstract. If, for example, the district court opinion injunction does not preclude you from saying, for example, this particular car wash place we happen to know has a policy of hiring illegal aliens. It doesn't preclude even that. It just says you can't say because it's a car wash, and it doesn't preclude you're saying we were chipped off that there are a bunch of illegal aliens at this place. Even that might be a problem, but if the injunction doesn't address that. Sorry to interrupt. I think part of the problem is I don't know if the injunction prohibits that or not. Why not? It's absolutely clear. She was absolutely clear in the injunction and in talking about the injunction. Well, let me try to explain it this way because the injunction refers to presence at a particular location. So your honor gave the example of the hypothetical. Well, say you have a basis from a tip that a particular car wash is employing aliens without a legal status. The suggestion was, okay, that's different. Now you have something else on top of the factors. Okay, what if last week the agents were in that location and arrested people there and therefore have a basis to believe? Is that also outside the scope of the injunction? And if all that is outside the scope of the injunction, I'm not sure what's left because presumably they're not randomly selecting locations. Well, actually it appears that they are randomly selecting, um, home depots where people are standing looking for jobs and, um, and car washes because they're car washes, um, et cetera. And your honor, if an agent then testified, oh, no, the reason we went to Home Depot is because based on intelligence, surveillance, our experience in the field, whatever else, our experience last week in the same location, that's why we picked it. Are we now outside the scope of the injunction because there's something else being considered or is it still ultimately based on presence at a particular location and therefore forbidden? I think, I don't know the answer to that, but I think this is why it is problematic under the Fourth Amendment to try to make these determinations outside the context of a particular fact pattern. We don't do these adjudications, uh, preemptively and hypothetically. We have to look at it in the context of particular facts. And if we did that, we might actually come to a different conclusion as to many of the examples, if not all of them that they have pointed to. Judge Gould, sorry to interrupt you, but I want to interject. You're already almost four minutes over your time that you've started with. And, uh, I still have another question. And I'll give, I'll give you three minutes for a bubble when we're done with the arguments on the other side of the case. My question remains, am I correct? I know I asked you this, but I want to tell you why I asked that there's a policy of deporting 3,000 people per day. It's because I read in preparation for this case that ICE had set a specific target of 3,000 deportations per day and sent that to all the field offices, to all their field offices. So I'm just trying to understand what would motivate the officers who did the roundup of aliens here to grab such a large number of people so quickly and without, you know, without marshalling reasonable suspicion to detain. And am I right that ICE set that target 3,000 people a day for all their field offices? I don't know, your honor. I believe that comes from a newspaper article that plaintiffs have cited. I think it came from the district court. Yeah, the district court may have repeated it. I believe the ultimate source of that was a newspaper article that plaintiffs cited in their documents that that was a target. I don't know. I don't know the answer to your honor's question, but we certainly do not accept the proposition that the individuals who were detained were detained without reasonable suspicion. I suppose it was true that there was a a high quota and as also a reporter that the agents were told that their jobs depended on pursuing much higher numbers than usual and in a more aggressive way. Would that matter? I don't think it would be enough, your honor. I think that might increase the risk of a constitutional violation in a particular case, but I don't think that alone would be sufficient for an injunction because it's not telling anybody to do anything other than abide by the Fourth Amendment standards that we fully accept that require a reasonable suspicion on an individual basis. So it's your representation that if on the preliminary injunction, when you have a full record, you're going to be able to demonstrate that in fact what the district court found was happening. Or put another way, is your argument that it's okay if it's happening? That if they are in fact stopping people on these four factors alone in combination, that's okay? Or is your argument that it's not happening? You're going to be able to show it's not happening. You're going to get a fair chance to show it's not happening and you're going to be able to. Okay, so there's two related questions. I think what we're going to show. There are two related questions. But I think we're going to try to show, and again, we haven't been able to, we haven't given an opportunity to marshal this evidence. So I'm not telling you what it's going to show because I don't know. But what we will attempt to show based on the declarations that we do have about our policies and practices and training is that the officers are instructed to find reasonable suspicion before they arrest. And we are not going to say that these four factors standing alone can never be sufficient. I think there are situations, probably. Right, all right. But you've already said that they're trained not to do this. But there are many people on the ground who say they are doing it. So the question of whether they, they are trained to have reasonable suspicion, but there were individuals who attested that they were basically standing there at a carwash and somebody came up to them and they, well, one of them and some came with guns and masks and many cars and many people and asked whether they were American citizens. And even when they said they were, they didn't accept that answer and they took them over somewhere else and then investigated further before they actually let them go. That's, there are at least a couple of people who say that. There are others who, I mean, there are, there's a non-trivial number of people who say that this is happening on the ground. So I think your honor, part of the problem is we do have a lot of anecdotes in the record. I think if your honor goes through them, it's a declaration and a penalty. I'm not trying to minimize it. There are declarations relating to specific incidents. I think if your honor goes through them, you will see, and for some of them, they're probably not detentions. Some of them are personally questioning without the condition of a detention. Some of them are clearly detentions, but we have no idea from the record whether there was reasonable suspicion or not, because we don't have the other side of that narrative. So correct me if I'm wrong, but nowhere in your motion for a day did you challenge any of the district court's findings that stops, detentive stops requiring reasonable suspicion have occurred, and nowhere did you challenge the district court's finding that they were based on these four factors alone, that stops based on these four factors alone have occurred. And the only thing that you said about the Fourth Amendment, those four factors not being one sentence in your motion after making all your other arguments about standing and vagueness of the TRO and all those other things, you had one sentence in your opening motion papers about that Fourth Amendment analysis of the district court. Is that all accurately describing your motion for a stay? No, not the last piece of it, your honor. We had an entire section about the four factors and why it was permissible to... You said that they were not, they cannot be categorically barred from considering them, but in terms of then you said even if, you know, the district court's order should be interpreted as only barring us from relying solely on them, they're wrong. And with no case law, no development, nothing until your reply brief. Is that correct? No, I don't think so. I'm looking at it right now. We have multiple pages on this. How many pages are you saying that you actually argued with case law that the reliance on the four factors is permitted but not enough? 15 to 17. 15 to 17. We talk about how we talk about the four factors that the court enumerated and how they can be considered. No, but it begins with insofar as the injunction means to prohibit the government from relying on the four listed factor as at all, which is what she said. And in our opinion, but there's no doubt about what she said. So what you're saying that that is what you addressed, but where do you address what she actually said? No, but your honor, if you read, if you continue reading the paragraph, we go through the factors and we cite cases saying that we can consider those factors. Yes, that's true. We all agreed on that. So then I don't, I don't really understand the issue then that these four factors can be relevant factors. I'm not aware of any that says when you put them together, they're categorically not enough for reasonable suspicion. Not enough and non-relevant are not the same thing. That's right. They're relevant. The cases say they're relevant and no case says they're not enough together. There are cases that say that race generally is not enough. There are cases that say language alone is not enough. But even if you look at plaintiff's own cited cases like Manzo Verado, they talk about how location or, you know, a particular location can be strong support for finding reasonable suspicion. Inability to speak English may support an officer's reasonable suspicion. Nothing about these people says that she didn't say inability to speak English. She said speaking Spanish. That's a completely different thing. Okay. Well, your honor, I'm not aware of any case law that says that's not, that that cannot be a relevant factor, nor am I aware of any case law that says when you put these four factors together, that that package is never going to be enough to satisfy. But that is a different argument from the one you made on pages 15 to 17, which is your argument, the way I understand that, is that we simply, there is, it is impermissible to issue an injunction of this sort. Not that these factors are enough, but that any type of injunction in the Fourth Amendment context saying these particular factors are not enough. So, for example, when we have said considering race alone is not enough, according to you, the arguments you're making at 15 to 17, that type of quote unquote categorical injunction is improper in the Fourth Amendment context because of a totality of tests. That's a different argument from saying race alone or these factors alone are sufficient to support reasonable suspicion in the Fourth Amendment context. Now I understand what you're saying. That argument, that last argument, I don't see made anywhere except in one conclusory sentence in your motion. I understand your point, your honor. Now, I apologize for not understanding sooner, but I think the points are related because the reason we don't do these categorical formulas in the Fourth Amendment context is because we can't say preemptively that there's not going to be some set of facts where these three or those four or those two aren't going to be sufficient. So, I think they're not totally separate points. The point is we have to do these analyses, and this Court has always done these analyses, on a particular fact pattern. And, of course, in a particular fact pattern, we can have disagreements about weight, about sufficiency, about whether the full package crosses the line or doesn't. But we have to be doing that not in the abstract, but on a particular set of facts. That's how I read Valdez-Vega on bank obtaining outcomes. So, if there was an announced policy that said that all ICE agents are to, regardless of reasonable cause, if they look at somebody and determine that they're Hispanic and hear them speaking Spanish and see them at a bus stop and think that they're a J worker, that's reasonable suspicion. And, if that were the official policy, there would still be no possibility of enjoining it. No, I don't agree with that, Your Honor, because I think there you would be saying this necessarily does satisfy reasonable suspicion. That would also be under the Fourth Amendment. So, that would be an overbroad policy under the Fourth Amendment because you would be saying these criteria alone equal reasonable suspicion. Well, that's not what the cases say. The cases say you've got to look at it case by case. But case by case has to encompass some contextual something other than those four things or else there's nothing more. So, since all that's being enjoined are those four things and if a policy about those four things wouldn't work and there's nothing that's negating context, simply those four things, then I fail to understand your argument. Your Honor, there is a possible reading of the injunction where it basically covers nothing. All right, well, suppose we simply say that we interpret the injunction as saying what I just said and not what you said in your brief. So, then what? Well, I think it would be less problematic if we clarify the scope of the injunction in a way that narrows it. But respectfully, Your Honor, that would narrow it to basically nothing because the locations are always going to be informed by some context or background or experience or surveillance or intelligence or experience in the field. They're going to be picked for some reason. And again, the court may find in a particular case it wasn't good enough. It wasn't a good enough reason in mind with the other factors to stop somebody. Or the court may find that it was good enough. So, the record on that point, and I'm taking you over your time, and I believe Judge Gould has promised you a few minutes of rebuttal. Looking at the TRO as a whole, all of the district courts reasoning, all of the evidence put in by the plaintiffs, as well as the government, it seems to me that the record establishes that the government is conducting picking locations. This is in your own dialectic based on information, past experience, showing that illegal aliens have used or utilized these locations or have found work at these locations. So, at most, by your own admission, that is the information by which you are picking these locations, public sidewalks, parking lots, bus stops, car washes, just based on information that, at some point in the past, illegal aliens have used them or used them to find work. That, if we were to say that even that definition of location, combined with the other factors under our case law, establishes only a general profile insufficient to support reasonable suspicion for detentive stuff, and that is what the district court order, read as a whole, is reaching. What case law do you have to suggest that that is incorrect? So, two points on that, Your Honor. First, I think if you look at the declaration, what it says is that those locations are selected for consensual encounters that may lead to reasonable suspicion. Not that we're just... That's not what the declaration says. The declaration said that people were detained and not even asked for their identification until after they were detained and taken elsewhere, for example. Some of the declarations say that, and some of them say that people came and asked questions. There's different declarations about different incidents, and they say different things, and they may have been based on different approaches that were being used, but Judge Sung was asking about the part of our declaration where we said locations are selected based on past experience, and the particular context of that testimony was that those places are selected for consensual encounters and questioning. Again, in a particular case... And the district court found that that was happening, but they were not consensual encounters, and you nowhere in your state motion challenge any of those factual findings. And I understand you have this broad argument that you weren't given enough time, but that doesn't actually constitute an argument for clear error on those factual findings. That's nowhere in your motion for a state, not even in your reply. Your Honor, I don't think... So I think we win regardless of those facts, and that's why our opening motion focused on standing, which doesn't depend on whether a particular SOF rose to the level of a detention or had reasonable suspicion or not. It requires more under Lyons, and so that was our point on standing. And then our point on the Fourth Amendment was whatever may have happened, this statement of law in the injunction is both imprecise with respect to the first half of the injunction and wrong in terms of saying that this bundle of factors is legally insufficient. So yes, we didn't go after the particular facts, but because they... What if we... In one of the cases, I forget which right now, there was added a sentence that said that non-detentive questioning was okay. What if we added that sentence? What if we said that that sentence should be added to the injunction? Well, non-detentive questioning doesn't require reasonable suspicion, so that's... Right. But with respect to detentive... But that would seem to solve all your problems. No, it doesn't solve the problem at all. It doesn't solve the problem of detentive SOFs based on reasonable suspicion, which we are doing, which we want to do, and which we are allowed to do. And the injunction constricts that by saying that these four factors cannot support... A loaner in combination cannot support reasonable suspicion, which the Supreme Court said we cannot do in the Fourth Amendment space. It's come up with these categorical rules. I'm sorry to interject, but we're probably double over your time. And I still have a question for you. And when I'm done... Yes, go ahead. When I'm done, I actually have two questions. When I'm done, my colleagues on the bench can ask as many questions as they want. And then when the appellee argues to us, we'll provide plenty of time. But the government is the appellee in the underlying case. But I'm viewing you as the appellant in this motion because the government is trying to stay the order that was entered, correct? Yes, Your Honor. Okay. Now the other question is, am I correct on a legal point that because the government is trying to reverse an injunction or restraining order, that it's the government that has the burden of proof on this motion that you've brought? We certainly have the burden of showing that we've satisfied the factors per se. I'm not sure it's a burden of proof because I'm not sure it's evidentiary. But we have to convince the court that we're likely to succeed on the merits and the balance of harm's favors. Okay. Thank you. And then my final question is, a request based on my being a little bit of a one-trick pony on this issue, the question is whether you could determine as a representative of the government, whether in fact there is a policy that ICE has directed its field offices to deport 3,000 people a day. Whether or not that direction is created by ICE or created by the president and the executive order or created by some subgroup like, well, there's three of them I was aware of, but any of those groups, could you determine that and then send a 28-J letter to the court that advises if there is such a policy? Sure, Your Honor. I will endeavor to do that. Okay. Now, Judge Rosado and Judge Sun, do you have further questions? I don't. I would only ask that, you know, if it's any variation of a 3,000, whether it's deportations or stops or arrests or whatever it may be, let's not put too fine a point on it. Understood. Thank you, Your Honors. I accept that as a friendly amendment. That's more precise than what I said. So, thank you. Okay. Now, we'll proceed.  I'll begin now. Thank you, Judge Gould. Good afternoon, Your Honors, and may it please the court, Muhammad Tadsar for the appellees, the plaintiffs in this case. You know, Judge Gould, I want to actually start where you just left off. You know, we're here on an emergency motion for a stay. Wait a minute. My sound was up too high. Okay. Go ahead. Okay. I'll restart. You know, we're here on an emergency motion for a stay, you know, which the Supreme Court has called, and I quote, an intrusion into the ordinary processes of judicial review. So, the question for us is, what evidence has the government brought to demonstrate that there is harm that requires an emergency motion for a stay? And I think this question will help us explain or kind of get to the bottom of our position on the Fourth Amendment question. But that question is related to the question of whether there really is a 3,000-person-a-day requirement. And if there is, and if it's being impeded, I guess that's an injury. Then we have to talk about whether the 3,000-person-a-day injury, I mean, is an injury. Marsha, your voice is fading out a little. Oh, I'm sorry. Is that okay now? I can hear you now, yeah. All right. Yes, Judge Berzon. I guess what I would say is they've offered some evidence for their claim of harm. So, what did they offer as evidence? In the PARA declaration, that's at 94.2 in the docket below, they say there's confusion because location and occupation are now prohibited factors, right? That's from paragraphs 10 to 14. And in the Quinones declaration, the second about what additional information, if any, would be needed if those factors are used. So, this is what they said. They have claimed that the harm from them is that location and occupation are prohibited factors. That is not a harm. That is a fundamental misreading of what the district court did below. And that's because the district court didn't prohibit those factors. What it said was what this court has said repeatedly for years. The underlying premise of the district court's restraining order is what this court has said nearly 40 years ago in Rodriguez-Sanchez. It said that reasonable suspicion cannot be based on broad profiles. What the government wants to say is that they want to stay this injunction and send us back to a world where a US citizen like Brian Gavidia can be grabbed, slammed against the fence, and have his phone and ID taken from him just because he was working at a tow yard in a Latino neighborhood looking the way he looks, right? The government's claimed emergency is that the TRO prevents them from carrying out this kind of immigration dragnet based on no more than these broad profiles that are well prohibited by the established law in this circuit. And the district court's order relied on what the district court said was a mountain of evidence to appropriately prohibit this officially sanctioned practice. So I'd like to turn to the merits a little bit and talk about some of the procedural issues that my friend raised on the other side and talk about the question of evidence. So they have taken issue with the procedures that the district court put in place. But as Judge Sung correctly kind of pointed out, this was not an FARTE request. They've had plenty of time to address the facts that we put together. Oh, they haven't had that much time. They have some time. They have some time. So they've had 25 days since the TRO application. So what I would have expected if I was them is I would have expected some evidence from the government about the stops. They say, my friend said on the other side, that they have not provided any evidence from the government. But that's not true. The record has evidence from the government. The only I-213 concerning the stops here was evidence we put into the record. And that document concerning the arrest of Mr. Vasquez-Perdomo, it is clear as day, it shows that the government had no evidence, nothing specific to support his detention and his ultimate arrest. What I anticipate is if the government has more evidence, all the I-213s will look exactly like that. Because what they're doing and what the district court found is that they're not engaged in the sort of case-by-case assessment of reasonable suspicion. They claim that we're the ones who offered and the district court enjoined a categorical practice, when in reality, they are the ones who are doing categorical determinations. They're the ones who are making stops and arrests without any case-by-case analysis of reasonable suspicion. The other thing that the government has pointed out is they've said, well, this injunction is a categorical rule that's prohibited by the Supreme Court's sort of precedent. The reality is it's not. It's quite the opposite. This is a particular immigration enforcement operation that the district court considered. And in that particular context concerning a particular type of immigration enforcement activity, the district court issued this TRO. If this court denies the motion and affirms the validity of the TRO, it's not going to be making a categorical rule that applies broadly throughout the circuit. That's not what this case is about. This case concerns a TRO that's based upon- Well, we wouldn't be making categorical statements, wouldn't we? Or maybe it would just be in deference to the district court that these four factors together are not sufficient for reasonable suspicion. I think that's right, Judge Berzelon. But I think the principle that that rule is coming from is a principle that says that these four factors have to be understood in a particular context. Can I, sorry, because the way I understand the evidence and the allegations of the complaint and the application for a TRO and the order read as a whole is that they are saying these four factors in the LA area where the Hispanic population is essentially on average almost 50% of the population, that there's large numbers of people who fit these descriptions, who fit these four factors with legal status, and that in this region of the country, there's- These four factors cannot possibly weed out those who have undocumented status and those who have documented legal status. That these four factors in this region is not sufficiently pervasive. All they do is form a general profile that fits both lawful and unlawful- people with lawful and unlawful status. And that is essentially all that the TRO is enjoining is the use of these four factors in this region under- in this factual context where this operation is taking place. That's right, Judge Stock. And that intuition, you know, that comes from, I think is well supported by both this court's case law and the Supreme Court. You know, the Supreme Court in Arvizu said precisely the same point that Your Honor is making. You know, they said, and I'm quoting here, you know, we think it's quite reasonable that a driver's various actions that were observed, quote, might well be unremarkable in one instance, such as a busy San Francisco highway, while quite unusual in another, such as a remote portion of rural southeastern Arizona. You know, that's what the Supreme Court said. So this, that basic principle that when you apply these general four factors based on broad profiles, general characteristics to an area that is, you know, that is one of the most diverse cities and regions in the world that you're likely to ensnare just as many people with status as people without status. And therefore it cannot be, it cannot meet the individualized, particularized suspicion requirements. Suppose they were to come in on a plural injunction and demonstrate that somebody did a study of, you know, everybody who stands in front of home depots to get day work and that 80% of them are actually not legally in the country. Is that, would that I don't think so. But in Paris, in Paris cruise, for example, there was, they had some evidence although it was old that they, this workplace had two or 300 illegal aliens at some point. And we said that I suspected that MSC was employing undocumented workers, just not provide reasonable suspicion that Paris cruise himself was undocumented. It's probable cause particularized with respect to one person. So that is a kind of hard question. Yeah. I think the question is particularity, you know, this, the Supreme court in Ibarra sort of set as particular to the person or particular to the workplace or particular to the location. It has to be particular to the person, you know, the person who's detained, there has to be reasonable suspicion asked for that particular person. You know, so consider the Supreme court's decision in Ibarra, you know, there the Supreme court said, Terry requires suspicion as to the particular person, even if quote, that person happens to be on premises where an authorized narcotic search is taking place and quote, you know, in Ibarra, that was a warranted investigation of a particular tavern based on probable cause. And the Supreme court still said, you need to have particularity as to the individual who is, who is frisked, right? Same, that's the same principle in Paris cruise, you know, even in a warranted investigation, there had a warrant in that case in that eyes, you still need particularity asked for the particular people. You would say that with respect to detentions for now, with respect to coming up and coming and asking people questions. Oh, correct. Nothing, nothing in the TRO stops the government from doing ordinary sort of investigations that they claim they're trained to do investigations could involve. I want to say, I want to say arrive with the mask people and the, and the guns and the, and the big trucks and all that. And then talk to somebody and ask some questions. Yeah. So we would say that is, you know, it depends on the facts, but that is not a consensual encounter. You know, we press this argument below the government has not defended its position on appeal. They they've essentially, as I understand it, they've essentially conceded that there are seizures happening. You know, I think if they were to come in and say, actually, these were all consensual encounters when we run up on that is what their, their declaration says, we're doing consensual encounters. It may, it may well be that I haven't pressed that argument. And I think they're going to have a very difficult time with the case law. I mean, the United States, Washington from this court identifies a number of different factors that determine whether or not there's a consensual encounter that, and literally any one of those five things, things like how many officers are there, whether there's physical force, like if they touch a person, if they block ingress and egress, the numbers of officers, whether there's guns, all in the declarations that we have offered to the, to the district court demonstrate that basically every single one of those factors was present at each of these stops. So on that record, I, it would seem to be incredibly difficult for the art, for the government to say, Oh, actually, you know what, if a masked sort of ICE agent comes without identifying themselves and has an assault rifle and stands up right next to you and blocks your ingress and egress, that's just a consensual encounter. Now, I don't think they could credibly make that argument, but that that's why what they're arguing here is that they had reasonable suspicion. The problem is they haven't offered actual evidence in any of these particular cases we did. And the evidence that we presented shows, you know, in the ITU 13 and Mr. Perdomo Vasquez, it doesn't say anything about why he was stopped. You would expect that it would say something there, you know, and to go back to the question about, you know, they haven't had that opportunity to, you know, offer evidence perhaps, but I would have expected maybe some evidence as to one or two of these stops, you know, but the district court reviewed a record that by our counts had more than two dozen incidents supported by near about 20 declarations, you know, one or two, they could have done that, but they haven't done that. That's why the district court called this a mountain. I feel that the pertinence of the declarations that don't pertain to the people who are said to be members of the organizations is really to show the policy or pattern. Exactly right. Exactly right. And that's not, that's just to demonstrate how widespread this practice is, but to go on. What about the articles that are attached to the, that are referenced in the complaint and attached to the complaint and weren't actually individually introduced into the record? Do we, can we look at those at all? I think you can, Judge Berzon. I think the, you know, those news articles are based on statements made either by witnesses or by, you know, the government's own sort of leadership about what happened here. And I think the district court can correctly did and can in the future consider those because you know, the evidence doesn't have to necessarily be in an admissible format, at least at this stage, but you know, so long as we can depose, for instance, the uh, uh, Greg Bavino, one of the defendants here who runs the border patrol sector that has that issue here, we can depose him and ask him, Hey, is it true that you said we have 50 strike teams on any given day that are going out and conducting these raids? Um, and, and that would demonstrate, yeah, actually they have, they have a policy, uh, and that's what they're, you know, they have a practice that's officially authorized and this is what they're doing. You know, on the question of officially sanctioned practice, if I may, you know, there is quite a bit of evidence in the record that we provided to the district courts, which enabled the district court on page 35 to say that there is a quote, plethora of evidence of an officially sanctioned policy. You know, this very practice was a practice that, um, the defendants, the government, um, uh, launched in the central Valley in, uh, in, uh, in Kern and it resulted in a preliminary injunction there. You know, they, uh, the government's sort of officials who led that practice prior to the entry of the preliminary injunction, they called that program a quote, proof of concept and quote, we cite this in our TRO application, um, in footnote 28, you know, they said it's a proof of concept. You know, we also cite, um, statements and reporting that demonstrates that the leadership at the white house instructed the defendants to stop focusing on targeted enforcement and criminals, and just go out and round up people at seven 11th and home depots. Those statements were newspaper articles, basically. They were, those were newspaper articles. The proof of concept is a quote. Um, and then, and to, to put that, you know, to put that whole issue to bed, their own statements, you know, defendants own statements, um, in the Kenyon declaration and in the Harvick declaration sort of confirmed the existence of the, of the policy, you know, in the, in the Harvick declaration at, um, at paragraph seven, you know, he says there are certain types of businesses, including car washes who have been selected for encounters because past experience has demonstrated that illegal aliens utilize and seek work. You know, that's precisely our point. You don't doubt that this is for functional purposes for appeal purposes at this point of preliminary injunction, because it doesn't have any, any ending. Um, you know, we haven't pressed that argument judge Burzon. I mean, it will, there is a preliminary injunction hearing sets. Yes, but it's way past 14 days. So we're not, we're not pressing the sort of that. Is there any plan for any discovery before the preliminary injunction hearing? We haven't discussed that yet with the government. Um, we managed, but we haven't done that yet. Because it's an awfully long period for a plural injunction successes like this. Actually, I agree. It wasn't your request. I know that. That's right. That's right. We requested an expedited, um, preliminary injunction schedule. The government wanted additional time and the district gave them additional time. And, you know, this goes back again, to go back to the process issue, the government can contest anything it wants in the, um, at the PI stage, or what it could do is do what rule 65 provides. They could move to dissolve the TRO based on new evidence that they come up in the course of their, um, their investigations, but they haven't done that. They've run to this court and ask this court to stay the injunction. And they've, and they've said that, um, you know, and they say that because you could also agree to have a trial in the marriage now. All of that is, you know, they, they, we can do all any of those things, you know, but the government hasn't offered any of those. And we, what we're trying to do is we're trying to resolve the harm that's faced that our clients are facing every day. And we're trying to move expeditiously and the government, um, you know, and the government has plenty of opportunity to, um, uh, to contest any of the, I have another question. The district court did not specifically, um, find standing as to the organizational plaintiffs. Does that affect our ability to, to do some? No, I don't think so. I mean, this court has to assure itself and indeed the district court of jurisdiction in this, um, in this case. And, um, and I think there's plenty in the record to support standing of the organizations. You know, I think the district court, you know, it did on page 46, you know, it did say that the experienced significant harm and they're likely to suffer irreparable harm. You know, the district court did make that finding, you know, but, uh, that's not enough, you know, this courts and the, um, this court has to assure itself of the existence of the controversy. And we can do it, you know, basically you can do it, you know, I think there's a little question about the, um, likelihood of recurrence. You know, this court in Melendrez said that that's, um, that's a quasi factual determination, the likelihood of what I'm sorry, sorry, the likelihood of recurrence of injuries. That's clear error reviews with regards to the, um, organizations. That's not any particular person. Uh, that's not any particular person, but, uh, you know, we've in the declarations, we have, uh, offered, you know, lots of stories about individual members who are harmed in exactly the same thing as my understanding is that they would satisfy standing. If some other, what's going to be stopped and have the same person. I don't think. I think that's right. I think that's right. I, you know, either way we, we have enough, you know, on this record, on this record, anybody who was stopped is like, like we think, you know, so for instance, um, uh, in the UFW, the eye farmer of his declaration, there's a, um, there's an anecdote about, um, a member, a U S citizen member named, um, on hell who's a day laborer who was stopped in precisely the same way. And, you know, he's a day laborer. So he's concerned that he's going to be stopped again. You know, those, one other question, um, is, um, whether there is any plan to attempt to preliminary certified class at the time of the preliminary injunction. Yeah, I think, you know, we haven't talked with the government about this, but I think that is our plan. Eventually we will try to do that. You know, we obviously, you know, at the TRO stage when it's an emergency, it's difficult to try to like move for a class, but that is something that, um, that, that we plan to do. What about the fact that the Supreme court in the AARP case said that you could have a punitive class? I think that, I mean, that w that is what we will see. Yeah. A punitive class or a preliminarily, um, certified class. So I think for me, this is my, my own sort of opinion about this. It's not clear to me that, uh, a provisional class kind of in the language like kind of exists. I think we would, we would go through the same certification process that happens if you move, you know, whether it's provisional quote unquote, or you just move for class search. It's basically the same standard. All right. But the Supreme court in one of the state, two of the state cases actually said that a punitive class could support the. That's what exactly. A punitive class means one that isn't certified at all. It's just asserted. Oh, I understand. So I think, so I can't, I can't tell you if a punitive, you know, whether or not we're going to sort of proceed on a punitive class. So if I could say, I think we will move to certify a class. I think that is our current sort of intention. And so, um, even if we didn't, uh, to the extent that that, um, you're concerned about the scope of relief question, I would just point your honors to the Washington V Trump, um, case from last week that makes clear exact, um, um, three things actually that the scope of the injunction that we is, um, uh, entitled to, um, uh, to, uh, quite a bit of discretion and that the discourse, um, uh, ability to review the scope of that injunction is of course in the language of, uh, last week is, is narrow. You know, the second thing I'd say just about that is that, you know, the, um, the government did not present any alternatives as to what an injunction could look like to that would provide adequate relief to our plaintiffs. And that, again, based on last week's decision from this court, that's fatal to any attempt from them to try to, um, uh, get out from underneath this injunction. Um, and then the last thing is their alternatives that they finally offered on reply are really inadequate. And I would just point your honors to, um, easy riders and, um, um, and in-depth and a few of these other cases. Yes, I have a final question in the history and the annals of us law ever since the United States has monitored immigration. Has there ever been a government agency that saw us during the target for 3000 Uh, persons to be removed per day, you know, judge Gould, I don't know the answer to that question. It would seem to be, um, quite unusual. Um, and that's one of the, one of the pieces of evidence that we have pointed to that demonstrates the existence of a policy. And just one clarification on that 3000 number, I believe it's 3000 arrests, you know, and one of the things we've pointed to in the evidence, we pointed to how exactly the government has said they want to effectuate those arrests. They have said that, um, they want to push the envelope, you know, turn the creativity, um, uh, knob up to 11. Um, they have said, if it ends in handcuffs, go out there and do it. You know, now they're not going to say, go out and violate the law, but there's been a wink and a nod from leadership to agents on the ground. That's to them that says, you know what, dispatch with the ordinary rigors of the law and go out there and snatch anybody up. You know, the, really the proof is in the pudding here. You know, they, they said in response to, you know, the secretary said in response to a question from a reporter about the TRO, the secretary said, nothing will change about what we're doing. You know, if that nothing will change. And if that's true, then why are we here? It's not clear why we're at an emergency sort of posture here. The problem is for them, nothing will change, but for us, everything will change. You know, there are more than, there are more than a dozen cities and counties who have come into this court and said that there's an extraordinary amount of fear and trepidation and injury that's happened throughout Southern California. You know, that's why cities have canceled 4th of July celebrations. That's why, you know, we have clients who have offered their stories, who have said that they're forced to spend money on Ubers and lifts because they've seen ICE agents hit bus stops and they're afraid of going on the bus, you know, on this record where it, where there's so many people with status, citizens, asylees who have been harmed and, and, and seized by the government. You know, I don't think there's any possibility for the district court not to have issued this, this TRO. And I would ask that this court not disturb the district court's well-reasoned analysis and it's, and the TRO here. So with that, thank you so much. Thank you. Let's see, any questions from Judge Prezan, Judge Prezan? Okay, hearing none, I think we'll return to the government. Initially, the government wanted three minutes for rebuttal, but we spent a lot of time and of course we've got time on this important case. So if you need more than three minutes, just ask me. Thank you. Thank you, Your Honor. I appreciate that. I'll try to be brief, but happy to answer any further questions, of course. First on the issue, I think it's clear that without an official policy, they have no basis to distinguish Lyons and Armstrong. I mean, we don't think that is enough, but it's certainly a bare minimum of what they need. Armstrong, I think was Armstrong. Yeah. Specifically said with regard to Article 3 standing, that the distinctions that are present here sort of back out Lyons. They cause the chain of causation and the fact that the plaintiffs don't actually have to do anything to be accosted and several other things. So the part of Hodges-Durbin that you're relying on is not the standing part. Because the standing part was to the contrary of what you're saying. Well, the court didn't decide standing in Hodges-Durbin. The court said, we're not sure if there's standing. Well, it decided in Armstrong as if it did decide standing. Okay. Armstrong, I think, is entirely different because in Armstrong, the universe of people covered by the policy was much, much smaller. The same was true in old Duke, right? You had a policy that applied to a pretty limited universe and the court said, yeah, okay, there, there's a sufficient likelihood. When you're talking about generalized law enforcement practices that can cover anybody in a district or city, that to me is classic Lyons territory or Hodges-Durbin territory. Whether you think of it as Article 3 or irreparable harm, you get to the same place, which is no injunction. Now, the point I wanted to make was that plaintiffs principally rely on Duke and Melendrez, which are the sort of broad Fourth Amendment injunctions that were issued after Lyons. And I just, I went back and looked because I thought it was interesting. Both of those cases involved close to five years of litigation before district courts entered those injunctions. Here, we had five business days. And there was a lot of moaning about that shouldn't have been, and we should have gotten to the merits a lot faster and so on. And there's probably a happy meeting there, Your Honor, but I do think there needs to be enough. I mean, it's a very serious thing to say that multiple federal government agencies have a policy of violating the Constitution. That's a serious thing to say. And I would suggest that that requires more than two business days of fact development before a district court should enter a sweeping injunction of this sort on that limited of a record. With respect to the Fourth Amendment, I'll just say- There is going to be a preliminary injunction hearing at which you will have the opportunity to provide different evidence. And then a merits hearing, which you could, if, as you say, there is evidence showing that either of these things are occurring or that there is more basis for reasonable suspicion, you will have full opportunity to prove that. Is that right? I'm not sure, Your Honor, because I'm actually not sure there can be a preliminary injunction hearing right now, given that there is a preliminary injunction in place that's on appeal. So it's a little bit complicated jurisdictionally. If this court vacates the PRO, then yes, we will have PI proceedings and a fuller opportunity to make- There's a PI proceeding scheduled, is there not? It is scheduled, but we've objected on jurisdictional grounds because the district court's been divested of jurisdiction over the PI, because the district court already issued a PI. I thought the district court has never divested of jurisdiction, even by a PI, and it certainly can go ahead with a final judgment, and it meanwhile does it all the time. Yeah, you can do final judgment, but another preliminary- Or because you have a different preliminary injunction. It could be different, but it can't be the same, which is what they've asked for. So they've asked for an identical- Well, I mean a different one, meaning a second one, an additional one. I don't mean to be introducing this issue into this proceeding. It's not really presented, to answer the question. Yes, we would be happy to present evidence, but we don't think that happened. We don't think it's fair that that happened, that we were hit with this sweeping injunction on a very limited and incomplete record, where the only evidence of our policy was a declaration that said, yes, reasonable suspicion is what we require when we go beyond a consensual encounter. But we're not actually doing what the district court found you to be doing, then, and has enjoined you from doing, then there should be no harm. You're only actually constrained if you're doing what she found you to be doing, and is telling you to not do, which you're either, it's unclear, denying that you're doing it all, or you're saying it's lawful. So if, you know, but if it seems on the evidentiary issue, you have to be saying we're not doing that, then you'll have the opportunity to show that. If you're not doing that, then you're not actually affected. So this goes to the irreparable harm. Then you get to your argument about confusion, right, about whether, what you can and can't do. But if we disagree that the district court's order is confusing, then what is the harm? To be told not to do something that you claim you're already not doing. Thank you. Thank you for raising that. I wanted to hit that point. So there's two aspects to it. The first part of the injunction says don't stop people without reasonable suspicion. That is a follow-the-law injunction that imposes harm because it's too imprecise. Yes, we believe we have reasonable suspicion for the stops, but when an injunction says that, it means the agents in the field are faced with a threat of contempt if the district court later concludes that their judgment call about the multifactor, totality of the circumstances, balancing test was wrong. That's why we don't do follow-the-law injunctions. So that's part one of the injunction. Part two adds to the four factors. It's a twofold harm. One, we do think that there might be cases where those four factors could support reasonable suspicion, or at least that it's inconsistent with the Fourth Amendment to rule that out preemptively. And so the inability to do that is a form of harm. But you're not doing it. I didn't say we're not stopping people based on the four factors. I said we believe the four factors alone could, in appropriate circumstances, support reasonable suspicion. It depends on the facts. It depends on what you mean by some of these factors. But we certainly are saying those four factors under the Fourth Amendment are not categorically inadequate. And the Supreme Court has said— Nobody is saying they are. I mean, let's just back that out of the discussion. All right? If you really still think there's something unclear about the district court opinion, we will clarify. The district court—let's take off the table and say you can't consider those four factors at all. What I hear you to be saying is that you just use the idea that reliance on these four factors alone in combination is insufficient. This gets back to the point I was asking you about before, which is that you basically didn't make that argument in your motion except for, in a few sentences, one conclusory sentence in your opening motion and maybe a paragraph in reply. So I think you thought that you made a related point about categorical exclusion, but in your alternative argument, that even if—you have not squarely argued in your motion that opening motion, other than one conclusory sentence, that reliance on these four factors alone or in combination is not sufficient to form reasonable suspicion in this context. So that has been a focus of your oral argument, but it's surprising to me because it was not at all the focus of your actual motion. Your Honor, I think it's subsumed by the point we were making in the motion, which is that under the Fourth Amendment, under Valdezvega and Arvizu and Banks, the court cannot say in advance, here is the formula, this doesn't work, across a whole set of cases. This court has said it can't be divorced from a particular SOB that's challenged. That's why we do this usually afterwards. I understand that is actually your argument. Yes. Okay. I understand that to be your argument, but that's a different one, in my opinion, from whether, if we disagree with that argument, these four factors alone only show a broad profile and not individualized suspicion enough to support a detention stop. I understand, Your Honor. All I would say is I think the reason we don't do these broad formulae is because it is possible that on a particular fact pattern, it will cross the line or won't, and we don't want to try to preemptively adjudicate that. Suppose we had an injunction saying you couldn't rely on Hispanic appearance alone. Would that be a valid injunction? Well, what this court said on that was it's generally not sufficient. I can't think of a case where it would be sufficient, but I also don't think you could have an injunction. If you have an injunction that says you can't stop people based on Hispanic appearance alone. And I don't think we would appeal that because I can't think of an example where it would matter, but I think as a matter of sort of standard Fourth Amendment doctrine, you don't decide this. Well, here, for example, there were several people who said that people in the same place at the same time doing the same thing who did not have Hispanic appearance were not stopped. And your Honor, for all we know, the agents who went in there had just spoken to a source who said there are three Guatemalans who are unlawful status who are working in this place. We have no idea. And if they said that it would make perfect sense for them to arrest those people and not the other. There's other evidence in the record that says they arrested Persians and they arrested Russians and they arrested others. So it's case by case. Actually, it said they didn't arrest the Persians and the Russians is what it said. That declaration said they didn't. There are other declarations where they did, which is, again, all of this is confirming my point, which is we cannot decide these things in a vacuum. There's a way these Fourth Amendment questions come up after the fact where the court can say, you know, I think you crossed the line from consensual encounter to detention based on the totality of the circumstances, and I think you didn't have reasonable suspicion based on the totality of the circumstances. But when we try to back up and do this in advance to cover a broad category of cases by Border Patrol and ICE and FBI and DEA and ATF, we are going to make mistakes and it's going to be overbroad. And that's why the law doesn't allow for that. And that's our fundamental problem with this with this injunction. I have a question on timing of our decision. Would either of you have an idea of the outside date when you'd like us to render a decision by? Your Honor, we don't try not to tell courts when to sign things. We obviously think this is urgent and there are ongoing operations that make it important. And that's why we've sought relief quite quickly and would appreciate a quick decision so that if needed, we can seek further relief. But I don't have like a date because there isn't some deadline coming up that's going to make it some critical difference. Every day is important. Thank you. Judge Gould, if that was a question for me as well, I'd say the same thing. We don't have a date. We'd leave it up to the court. It sounds like both of you would like us to issue a decision. As early as we can and ahead of waiting for the district court. Yes, Your Honor. Thank you. Happy to answer any further questions. I realized I'm all over my time. No, that's OK. We asked you a lot of questions. I would say we appreciate the excellent arguments on both sides of the case. And you both helped our panel a great deal by eliminating your respective positions. And I can't speak for each of my colleagues today, but for me at least, the argument and the advocacy is the most important part of the process. I'd like to add an appreciation for both arguments as well. They were helpful, measured, and well put together. Thank you, Your Honor. OK, not to say anything further. Hearing nothing, this case will now be submitted. We apologize. I apologize for wearing out counsel and my panel. With that, we shall adjourn and you will hear from us in due course. This court for this session stands adjourned.
judges: GOULD, BERZON, SUNG